IN THE UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RAJIV SOOD, M.D. | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:18-cv-2696 |
| | ) | |
| v. | ) | |
| | ) | |
| INDIANA UNIVERSITY, THE INDIANA | ) | |
| UNIVERSITY BOARD OF TRUSTEES, INDIANA | ) | |
| UNIVERSITY-PURDUE UNIVERSITY | ) | |
| INDIANAPOLIS, INDIANA UNIVERSITY SCHOOL | ) | |
| OF MEDICINE, MICHAEL McROBBIE, in his official | ) | |
| capacity as President of Indiana University, NASSER H. | ) | |
| PAYDAR, in his official capacity as Executive Vice | ) | |
| President, Indiana University and Chancellor, Indiana | ) | |
| University Purdue University Indianapolis; and, JAY L. | ) | |
| HESS, in his official capacity as Dean, Indiana University | ) | |
| School of Medicine, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Rajiv Sood, M.D., by counsel, files his complaint against Defendants Indiana University, the Indiana University Board of Trustees, Indiana University-Purdue University Indianapolis, Indiana University School of Medicine, Michael McRobbie, in his official capacity as President of Indiana University, Nasser H. Paydar, in his official capacity as Executive Vice President, Indiana University and Chancellor, Indiana University-Purdue University Indianapolis, and Jay L. Hess, in his official capacity as Dean, Indiana University School of Medicine and states as follows:

**THE PARTIES**

1.     Plaintiff Rajiv Sood, M.D. ("Dr. Sood") is a tenured professor at Indiana University, Professor of Plastic Surgery, Indiana University School of Medicine, the Medical

1

Director, Richard Fairbanks Burn Center, Eskenazi Health ("Eskenazi"), and the Dr. Sanford and Thelma Glanz Professor of Surgery.  Dr. Sood is a world renowned burn surgeon who, over the last 26 years, has dedicated his life and practice to Indiana University.

2.      Defendant Indiana University ("IU") is a public institution which operates eight campuses throughout the State.

3.      Defendant IU Board of Trustees is the University's governing board of Indiana University and has ultimate authority over its campuses, including making policies and decisions about faculty appointments.

4.      Defendant Michael A. McRobbie is the President of IU who provides central leadership to all IU campuses.

5.      Defendant Indiana University-Purdue University Indianapolis ("IUPUI") is one of the eight campuses administered under the IU system.

6.      Defendant Nasser H. Paydar is the Executive Vice President, IU and Chancellor, IUPUI ("Chancellor Paydar").

7.      Defendant Indiana University School of Medicine ("the Medical School" or "IUSM") is a school within IU.

8.      Defendant Jay L. Hess ("Dean Hess") is the Dean of the Medical School.

## JURISDICTION

9.      This Court has jurisdiction of this case pursuant to 28. U.S.C. §1331 and §1343.

10.     Venue is proper is this district pursuant to 28 U.S.C. §1391.

11.     Declaratory relief is authorized by Federal Rule of Civil Procedure 57 and by 28 U.S.C. §2201 and §2202.

12.     This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation, under color of state law, of rights secured by the Fifth and Fourteenth Amendments to the Constitution of the United States.

## INTRODUCTION

13.     This matter relates to the Defendants' termination of Dr. Sood as a tenured professor of the Medical School effective August 30, 2018, which includes the termination of all compensation and benefits as well.  The Defendants have terminated Dr. Sood even though they never provided him with adequate notice of the charges against him, a fair and objective investigation, a hearing before a neutral, objective committee or tribunal, and without regard for Dr. Sood's rights and interests recognized and protected by the United States Constitution as well as the policies and procedures governing such decisions.  The Defendants formed a pre-determined decision to fire him regardless of any information provided to them in his favor.  At each step in the process there has been a rush to judgment, an obvious bias, and an express rejection of requested rights and an opportunity for a fair and objective hearing.  The termination of his professorship and compensation is directly contrary to IU's own policies which state that:  "Upon receipt of the dismissal notification, a faculty member or librarian must be accorded the opportunity for a hearing."  It is also contrary to IU policies which require continued compensation during the pendency of dismissal proceedings.

## FACTS

### Dr. Sood's Professional Background

### Education

14.     In 1984, Dr. Sood obtained his Doctor of Medicine from Albany Medical College of Union University in Albany, New York.  He completed his internship and residency at Temple University Hospital, Philadelphia, where he became Chief Resident.  Thereafter he

completed two fellowships including a plastic surgery fellowship at the Cleveland Clinic Foundation and a second fellowship in hand and microsurgery at the Raymond Curtis Hand Center of Union Memorial Hospital in Baltimore, Maryland.

### Appointment as an IU Professor

15.     In July 1992, IU appointed Dr. Sood as Assistant Professor of Plastic Surgery in the Medical School.  As he was advised, his advancement in rank as well as tenure would require documented evidence of successful teaching, service and an active research program. His initial duties included patient management at the IU, Wishard Hospital, and Veteran's Administration Hospitals.

16.     Dr. Sood's primary workplace throughout his distinguished career has always been at Wishard Hospital (now Eskenazi), where he has historically spent at least 70% of his time.  From 1992 through today, he has served continuously as the Director of the Wishard/Eskenazi Burn Center.

17.     Following 18 years of significant accomplishments at and for IU, Dr. Sood was granted tenure by Indiana University School of Medicine in 2010.

### Dr. Sood's Accomplishments

18.     Dr. Sood has devoted his life to IU and has represented IU on the world stage. He has educated countless students, created a burn fellowship program for established plastic surgeons, created cutting edge surgical techniques for burn patients, and conducted at least 24 Independent Research Board approved research studies.  He has received grants and fellowship awards benefiting the IU and the Medical School, made over 219 presentations at conferences around the world, authored 139 peer reviewed abstracts, and authored and co-authored 64 articles and book chapters.  He has been involved in multiple video productions relating to burns and burn safety, including a two-time Edward R. Murrow award winning video

documentary that followed the treatment course of four paint truck fire patients treated at the Eskenazi Burn Center.

19.     Dr. Sood has designed and assisted in securing funding for four state-of-the-art burn centers, including the Richard M. Fairbanks Burn Center at Wishard; the Meehan Children's Burn Center, San Salvador, El Salvador; the Speedway Burn Center at IU Health Riley Children's Hospital; and, the Richard M. Fairbanks Burn Center at Eskenazi.  Presently, Dr. Sood is designing a burn center to be located in Eldoret, Kenya, as part of IU's long-term support for the development of medical facilities in that community.

20.     Dr. Sood's accomplishments have been recognized by multiple outside sources. For example, in 2008, the Indianapolis and Marion County City-County Council enacted City-County Resolution No. 42, recognizing and honoring "the contributions and accomplishments of Dr. Rajiv Sood to the health care community" and the "value and significance of the services offered by the Richard M. Fairbanks Burn Center and its staff to the State of Indiana."  That resolution stated:

- "Dr. Sood has achieved a prominent national and international reputation and is a well-known investigator and national leader in research and clinical experience in emerging technologies for skin replacement;"

- "The burn center "is regarded as one of the finest and most progressive burn centers in the United States" and "is the only adult burn center that serves central and southern Indiana."  More than 350 burn patients are treated as inpatients and approximately 1,500 are seen as outpatients each year;" and,

- "The burn center staff handles other wounds, provides a full range of plastic surgery services, regardless of payor source, and has carried this concept forward on an international basis."

21.     Dr. Sood has led multiple international medical missions.  From 1995 through 2007, he helped lead medical mission plastic surgery camps for the indigent in Southern India and since 2006 has served as the medical team leader for annual missions to both El Salvador and Panama.

22.     Dr. Sood was instrumental in the founding of three burn programs to help burn patients cope with emotions and practical issues including:  (1) an informal Burn Survivor Support Group; (2) Survivors Offering Assistance in Recovery (S.O.A.R.), which helps prepare patients for the transition from the hospital to the outside world; and (3) Image Enhancement, a spa that teaches patients how to camouflage scars.

23.     Significantly, Dr. Sood has dedicated his skills and talents to teaching students and doctors at IU and throughout the world.  As a testament to that fact, in 2014 Dr. Sood received the Teaching Award from the Medical School's Department of Surgery.

**Relationship with Learners and Colleagues**

24.     Medical students have praised Dr. Sood's teaching capabilities.  Students have advised that Dr. Sood set high expectations for their work and performance and he is a very effective clinical teacher.

25.     Multiple physicians, nurses, students, and administrators have described Dr. Sood as follows:

- "an absolutely phenomenal surgeon;"

- "empowers RNs to make proper decisions;"

- "values nurses and competence;"

- "extremely talented with amazing clinical expertise;"

- "patients and families love him;"

- "professional and caring with families;"

6

- "cares greatly about and challenges learners;"

- "tries to be inclusive of all staff;"

- "positive with residents and forces them to think and be prepared;"

- "has never seen him belittling anyone or out of control;"

- "Dr. Sood's high retention rate for nursing reflects positively" on his character;

- has "high expectations for himself and others, and they all relate to taking care of patients;"

- "Dr. Sood's national reputation is helpful for residents and faculty members in getting jobs;

- he "can be frank and direct, but is never mean or disrespectful;"

- "the plastics division improved significantly during the three years that Dr. Sood served as chief;"

- "Dr. Sood handled situations well and in a calm fashion;"

- "he has a direct style, but this also works well because Dr. Sood deals with problems quickly and effectively without allowing the problem to escalate or linger;"

- he is "not outside the realm of a 'normal' surgeon in terms of his intensity or his expectations;"

- "a really good teacher who takes a special interest in residents;"

- "has an open door policy and is very approachable;" and,

- "Dr. Sood is the reason the [burn] program is well respected."

26.     Dr. Sood has performed countless operations and developed cutting edge techniques.  For example, his hybrid cutaneous technique saved the lives of four children in the Riley Burn Center over the past two years, and, more recently, a child with full thickness burns over 95% of the child's body.  Dr. Sood is the only doctor in North America using these techniques.  At present, Dr. Sood is embarking on a program to train physicians nationally and internationally in his life-saving techniques.

### Dr. Sood's Tenure as Chief of Plastics Division

27.     In August 2013, Dr. Sood was selected to be Chief of the Plastic Surgery Division over four other candidates.  Dr. Sood understands that part of the reason he received the appointment was because the plastic surgery faculty and all of the eighteen plastic surgery residents expressed their support for Dr. Sood.  He was proud that he had been selected and viewed it as a great honor.

28.     As the Chief, Dr. Sood was responsible for new areas in addition to the work already described.  He was required to supervise and manage the practices of doctors, nurses, and other professionals at multiple academic hospitals.

29.     From August 2013 until September 2017, Dr. Sood made significant improvements in the Division.  These included an increase in the faculty from six to twelve, an increase in publication rates of 230%, and an expansion of the residency program.  He also negotiated new sites of service and changed the entire teaching curriculum, which resulted in a 100% pass rate for learners – a significant increase over the 60% pass rate under his predecessor.  In addition, he insured that every year there was a presence of IU plastics faculty at every national conference pertaining to plastic surgery, and established a basic science research lab including the hiring of a Ph.D. for plastic surgery research.

### Improvements in the Division

30.     He also continued to make strides in the Eskenazi Burn Center.  There are 120 burn centers in the country and only 70 are verified (a stringent review process conducted by the American Burn Association).  Eskenazi's burn center was recently verified with special commendation (one of only two that received such an honor).

### Challenges as Chief

31.     But Dr. Sood learned there was a downside to serving as Chief.  He discovered that being responsible for and supervising a diverse group of doctors and other professionals practicing at multiple hospitals was hardly an easy task.  He encountered infighting, perceived jealousies, and backbiting.

### Continued Accomplishments

32.     Despite the additional demands as Chief, Dr. Sood continued to work with faculty and other professionals in a productive manner.  For example, in November 2016, Gary L. Dunnington M.D., Chairman, Department of Surgery, IUSM ("Dr. Dunnington") praised Dr. Sood:

> "Raj, I was so pleased today to hear Heidi's review from her attendance at one of your recent division meetings. She described your leadership as inclusive, engaging of all faculty, and impressive for seeking feedback for decision-making.  Thanks very much for continuing to role model excellence in leadership."

33.     In January 2017, the American Board of Plastic Surgery, Inc., reported that all the Medical School's plastics program graduates had successfully passed the written and oral examinations.  This reflected a 100% pass rate for the last three years that was achieved under Dr. Sood's leadership.  Dr. Dunnington wrote Dr. Sood:  "Great work and a great turnaround!" (The pass rate prior to Dr. Sood's becoming Chief was 60%.)

34.     On March 30, 2017, Dr. Dunnington gave Dr. Sood his annual review as Chief, which was positively glowing.  Dr. Dunnington stated that he had "seldom seen any leader in my years in academic surgery who has made a greater effort with time and commitment to improving their effectiveness as a leader."  Dr. Sood "communicates very effectively with faculty and does so with integrity and openness, which inspires growing trust."  "He has been relentless in his promotion of research productivity by all faculty and residents in the Division and the dramatic increase in clinic research productivity for the Division is the best metric of success in this area."  "Few have made greater effort to grow the clinical practice."  "He leads by example."  "His management of personnel has been perhaps, one of his greatest areas of improvement, as he does so now with a high-level of professionalism and self-awareness."  Dr. Dunnington told Dr. Sood that he saw "nothing but great opportunities ahead for the Division of Plastic Surgery under Raj's leadership."

35.     In the Spring of 2017, as he had every two years for the last 26 years, Dr. Sood applied for reappointment to the medical staff of multiple institutions including Eskenazi, St. Vincent Indianapolis and Carmel, Speedway Burn Center/Riley Outpatient Children's Hospital, and IU Health-Academic Health Centers ("IUH-AHC"), the credentialing body for University Hospital and Riley Inpatient Hospital.

36.     Dr. Sood's reappointment applications were ultimately approved by Eskenazi, St. Vincent Indianapolis and Carmel, the Speedway Burn Center/Riley Children's Hospital, and IU Saxony Outpatient Center, with no complications.

37.     Prior to his becoming Chief, there was very little adverse information in Dr. Sood's professional standards file.  He was credentialed at multiple hospitals and had been re-credentialed every two years over a 26-year period.  To his knowledge, all evaluations and recommendations were positive.

**The Commencement of Multiple Proceedings and Actions Specifically
Intended to the Result in the Pre-Determined Dismissal of Dr. Sood**

38.     In mid-July, 2017, Dr. Sood was *blindsided* when Dr. Dunnington told him that something "had popped up from his past" in connection with re-credentialing by IUH-AHC. Dr. Dunnington advised him also that he did not believe it would be a problem.

39.     This marked the beginning of the most difficult year in Dr. Sood's professional life.

**The IUH-AHC Credentials Committee**

40.     Unbeknownst to Dr. Sood, in August 2017, an investigation was commenced by the IUH-AHC Credentials Committee ("Credentials Committee") relating to Dr. Sood's application for reappointment arising out of  negative reference by a physician.  Five of six physicians recommended reappointment, but one physician advised that Dr. Sood had a "history of repeated episodes of unprofessional conduct" and that he blamed IU for enabling the alleged "hostile behavior" to exist.  The Credentials Committee did not provide Dr. Sood with this information.

41.     On August 25, 2017, Mark Luetkemeyer, M.D., President, IUH-AHC Medical Staff and Chair, Medical Staff Executive Committee ("MSEC") notified Dr. Sood that his reappointment application to AHC was conditionally approved for a three-month period (not two years) in order to allow it to evaluate the information received during the primary source verification process.  The letter did not set forth even general areas of inquiry, let alone specific details of any adverse information.

42.     On August 29, 2017, Dr. Luetkemeyer met with Dr. Sood to advise him that MSEC was concerned over allegations of "ongoing bullying and intimidation."

43.     On September 5, 2017, Dr. Dunnington spoke to Dr. Sood about his status as Chief in light of the issues raised during the re-credentialing process. Dr. Sood advised him he would resign as Chief of the Division of Plastic Surgery.  Dr. Dunnington stated that it was his "belief that Dr. Sood's stepping down as Chief" addressed the "issues raised in the credentialing process" and would "encourage the committee to look favorably on continuing your credentialing at the AHC."  Dr. Dunnington told Dr. Sood that he would continue in his role as Director of the Burn Center at Eskenazi.

44.     In a letter dated September 14, 2017, Dr. Luetkemeyer advised Dr. Sood that he was to appear before the Investigations Committee of the IUH-AHC MSEC on September 21, 2017, to discuss, explain or refute three subject areas of concern:  "ongoing bullying and intimidation;" the "ability to work harmoniously with others;" and "retaliatory behavior."  Dr. Sood was advised, "this meeting is not a hearing and none of the procedural rules for hearings shall apply.  Lawyers shall not be present at this meeting."

45.     Following receipt of the letter, Dr. Sood expressed his concerns that he had only been apprised of three general "concerns in rather broad terms and without any specifics."  In order to prepare for the meeting, Dr. Sood requested notice and an explanation of the specific allegations of his wrongdoing.  No such information was provided.

46.     On September 21, 2017, Dr. Sood met with the Committee.   It did not go well. Dr. Sood was initially advised that he had nine minutes to present information.  Based upon the committee members' demeanor and conduct, Dr. Sood quickly concluded that they had already determined that he was an "intimidating bully" who could never change.  Dr. Sood was peppered with questions and statements which assumed he was guilty.

47.     The following day, September 22, 2017, Dr. Luetkemeyer advised Dr. Sood by letter that the Investigating Committee recommended that he seek a professional assessment at

the Professional Renewal Center ("PRC"), Lawrence, Kansas.   The PRC is a nationally recognized setting for the assessments/evaluations of professionals, and the provision of follow-up remediation services.   It is used by health systems, hospitals and other organizations around the country to assist with assessment and rehabilitation of professionals facing allegations of disruptive behavior as well as drug and alcohol addiction.

48.   Dr. Sood complied with the MSEC request and, from September 28 to October 1, 2017, underwent an evaluation at the PRC in Kansas.   The professionals there interviewed multiple individuals who worked with Dr. Sood on a daily basis, but limited to individuals initially recognized by the MSEC.   As the PRC advised, "With assistance, support, and redirection he was able to acknowledge the PRC clinical team's observations and reflect on those when PRC team members encouraged him to do so.   Typically, such openness to feedback is a good prognostic sign."

49.   Two days after Dr. Sood returned from the PRC, on October 3, 2017, the MSEC voted to immediately revoke Dr. Sood's medical staff membership and clinical privileges at IUH-AHC.

50.   On January 31, 2018, Dr. Sood advised the MSEC that he would allow his privileges to lapse.   He planned to submit an application for re-certification after completing counseling and successfully establishing that he should be allowed to return to the IUH-AHC. Further, D. Craig Brater, M.D., the former Dean of the Medical School, told Dr. Sood that he believed allowing his privileges to lapse was the appropriate course of action and Dr. Sood could re-apply at a later date.

51.   That same day, after agreeing to allow his privileges to lapse at IUH-AHC, Dr. Sood learned that the Medical School was now reviewing his status as a faculty member.

52.     On February 21, 2018, IU Health Physicians ("IUHP") terminated Dr. Sood's employment agreement immediately and without notice.

53.     Following his dismissal from IUHP, on or about February 23, 2018, Dr. Sood commenced employment by Eskenazi Medical Group, Inc.

### The Medical School Investigation

54.     On February 23, 2018, Elizabeth E. Dankoski, M.D., IUSM Executive Associate Dean, ("Dr. Dankoski") met with Dr. Sood to advise him that she was conducting an investigation against him on behalf of the Medical School.   According to her, "the main concerns involved:

- Bullying, retaliation, and harassment leading to
- Loss of medical staff privileges (i.e. allowing them to lapse), and
- Neglect of duties due to the loss of IUHP employment agreement."

According to Dr. Dankoski, "the first step in the dismissal process was being pursued; namely, an investigation regarding whether the misconduct can be properly characterized as misconduct."

55.     It was clear from the outset that the investigation would result in a termination recommendation.   As Joseph Scodro, IU Deputy General Counsel, advised David Jose, Dr. Sood's counsel on the very same day, the Medical School was interested only in "a permanent separation from Dr. Sood."   Further, plastic surgery faculty were told that Dr. Sood would be losing his faculty status.

56.     On March 2, 2018, Dr. Sood sent a list of potential individuals who should be interviewed to Dr. Dankoski.   Dr. Sood also advised Dr. Dankoski that he could provide a list of residents who would be honest in giving her a fair representation of him as a teacher and educator.   She never contacted him for that information.

14

57.     On March 14, 2018, Mr. Scodro, without any consultation with Dr. Sood or his counsel, forwarded an unreasonable timeline that assumed the entire process to revoke Dr. Sood's tenure would be complete in less than four months.  In the schedule provided on March 14, Dr. Sood was commanded to provide Dr. Dankoski with all materials he wanted her to review by March 2, a deadline that expired twelve days before Mr. Scodro even provided the schedule.

58.     On March 21, 2018, Dr. Sood forwarded eighteen additional names to Dr. Dankoski.  Dr. Dankoski did not conduct the requested interviews.

59.     On April 16, 2018, Attorney Scodro sent Attorney Jose an e-mail regarding "Sood Timeline for Investigation and Possible Dismissal" in which he stated that Dr. Dankoski's report was expected to be received that day.  It was clear that Attorney Scodro knew she would recommend dismissal and the Dean would agree.

60.     Attorney Scodro stated that the next step in the process required a meeting between Dean Hess and Dr. Sood, and stated that he had "taken the liberty of placing a hold on the Dean's calendar for Monday, April 23 from 4:15 – 5 pm [45 minutes]."  Attorney Scodro also advised that it was necessary to form the Conduct Characterization Committee -- and even provided the name of Dean Hess' nominee.

61.     On April 23, 2018, Dean Hess met briefly with Dr. Sood.  Dr. Sood found the meeting to be hostile and it was clear to him that Dean Hess had clearly concluded that he should be dismissed and was not interested in listening to Dr. Sood.  He was provided with a packet of documents he had never seen before, including Dr. Dankoski's report and summary of investigation.

62.     The report from Dr. Dankoski dated April 16, 2018, described certain broad and general allegations and action by IUH and IUHP, all of which arose out of and related to Dr.

Sood's professional activity, leadership and conduct. There were never any allegations raised relating to Dr. Sood's technical skills or capabilities, nor about his personal behavior or conduct outside of his employment or professional setting.

### The Conduct Characterization Committee

63.     Dr. Sood requested that Dr. David Crabb serve as his designee on the Conduct Characterization Committee.  Dr. Crabb is the Chief Medical Officer for Eskenazi Health, and a longtime member of the IUSM Faculty.  Attorney Scodro rejected Dr. Crabb even though there are no such grounds for such rejection under the Policy.  As a result, Dr. Sood was required to name an alternate designee for the 3-person Committee.

64.     By April 26, 2018, the Conduct Characterization Committee was formed, with the stated purpose of "rendering an opinion as to whether the nature of the alleged conduct may properly be characterized as 'serious misconduct' as defined in the policy."  Dean Hess also advised that the policy "states that if the Committee deems the pursuit of dismissal proceedings to be inappropriate, it should also state and may go on to suggest alternate ways to accommodate the interests of the faculty member of the School."

65.     The Committee met on May 2, 2018, and interviewed Dr. Sood by telephone.  In accordance with the deadline established by Dean Hess, on May 4, 2018, the Committee issued findings to Dean Hess.  While stating that Dr. Sood's behavior was unprofessional, it concluded that "Dr. Sood is deeply regretful for his actions and per the PRC report may be remediable."

66.     The Committee has "reached consensus in our belief that Dr. Sood be allowed a time to remediate in accordance with the PRC recommendations."  The Committee provided a proposal for remediation which is now being implemented by Eskenazi.

### The Dean's Recommendation

67.     On May 18, 2018, Dean Hess sent a notice to Dr. Sood of his intent to dismiss Dr. Sood from the faculty, ignoring the Committee's recommendation that remediation be pursued.

68.     On June 22, 2018, Dean Hess forwarded his recommendation to the Vice Chancellor's office recommending dismissal of Dr. Sood.  The single allegation that served as the stated basis for the Dean's decision was:

> "Allegation: You have engaged in serious **professional misconduct** and persistent neglect of duties or persistent failure to carry out the tasks reasonably expected of a person holding the position involved."

69.     No other meetings were offered by Dean Hess, either before or after the Conduct Characterization Committee met or issued its decision, or prior to Dean Hess issuing his decision to the Vice Chancellor. Dean Hess ultimately issued his decision without allowing for any form of hearing.

70.      As part of the submission to the Vice Chancellor, Dr. Sood submitted a letter dated July 6, 2018 from Dr. David Crabb, the Chief Medical Officer for Eskenazi Health (the "Crabb Letter") noting the fact that Eskenazi Hospital was historically the location for approximately 70% of Dr. Sood's professional services and activity.

71.     The Crabb Letter also described how Eskenazi Hospital hired an independent, outside employment attorney to conduct interviews of the Eskenazi Health Burn Unit employees "to determine the environment of the Burn Unit in general, and to uncover any specific employee concerns. Employees reported no concerns related to Dr. Sood's behavior."

72.     As part of the process before the Vice Chancellor, Dr. Sood and his counsel requested the opportunity to meet with the Vice Chancellor.  The Vice Chancellor refused.

73.     On August 1, 2018, the Vice Chancellor issued a recommendation to the Chancellor "that Dr. Sood be dismissed based on persistent neglect of duties or persistent failure to carry out the tasks reasonably to be expected of a person holding the position involved and/or acts which constitute flagrant breach of university rules or academic ethics and which involve moral wrongdoing." This was issued without meeting with Dr. Sood or allowing for any form of hearing.

74.     Dr. Sood then personally requested that the Chancellor meet with him prior to making his decision.  The Chancellor refused.

75.     On August 17, 2018, the Chancellor without any hearing, terminated Dr. Sood and stated "Pursuant to applicable university policy, your tenured appointment will conclude effective August 30, 2018."  This was despite the request by Dr. Sood as part of his submission that any effective date for dismissal be after the time necessary for a hearing before the Faculty Board of Review.

76.     On Friday August 17, 2018, legal counsel for Dr. Sood requested that Attorney Scodro provide a copy of the policy referred to and relied upon by the Chancellor in establishing August 30 as the effective date for the termination. Mr. Scodro provided an electronic link to a Policy entitled, "Permanent Separations for Academic Appointees," which lists the IU Board of Trustees as the "Responsible University Administrator" (the "Separation Policy").

77.     On Monday August 20, 2018, legal counsel for Sood sent a letter to Mr. Scodro pointing out that the Separation Policy makes a distinction between the effective date for a dismissal of a tenured professor based upon whether the grounds were "personal misconduct" versus "professional misconduct." While a shorter period may be given when the faculty

member is being dismissed for "serious personal misconduct" (at least 10 days' notice), the notice period for "professional misconduct" must be for one year.

78.     On August 22, 2018, Mr. Scodro advised that the August 30, 2018 effective date for termination would not be revised.

79.     On August 27, 2018, Attorney Scodro advised that there would be no hearing prior to termination and any post-termination hearing by the Faculty Board of Review would not affect the Chancellor's final decision. He also advised that adequate due process had been provided to Dr. Sood.   Subsequently, he advised that all salary and benefits would be terminated effective August 30, 2018 as well.

80.     That position is directly contrary to IU policies which specifically state that: **"Upon receipt of the dismissal notification, a faculty member or librarian must be accorded the opportunity for a hearing."**   Further, a faculty member "shall be suspended during the pendency of dismissal proceedings only if immediate harm to himself, herself, or others is threatened by continuance. Any such suspension shall be with pay."

81.     Dr. Sood has 30 days to initiate an appeal of the Chancellor's decision to terminate.   He intends to appeal, has contacted the Faculty Board of Review, and is preparing his appeal.

## LEGAL CLAIMS FOR RELIEF

82.     Dr. Sood, as a tenured professor, is a public employee and has a constitutionally protected property interest in continued employment.

83.     Defendants intend to terminate Dr. Sood effective August 30, 2018 despite the fact that he has not been afforded a hearing by an impartial, neutral tribunal including, but not limited to the IUPUI Faculty Board of Review.

84.     Because Dr. Sood has been fired effective August 30, 2018, he has been deprived of his protected interest in continued employment without due process.

85.     The Defendants denied Dr. Sood due process by denying him the opportunity to be heard at a meaningful time and in a meaningful manner including, but not limited to:

    a. Forming a pre-determined decision to fire him regardless of any information provided to them in his favor;

    b. Failing to conduct an impartial investigation;

    c. Refusing to meet with Dr. Sood;

    d. Refusing to provide him with sufficient notice, a real opportunity to be heard and listened to, and a refusal to allow him the opportunity to examine witnesses against him;

    e. Failing to provide a hearing by an impartial, neutral fact-finder;

    f. Acting in a manner contrary to their own procedures, by-laws and other rules; and,

    g. Treating him differently than other similarly situated individuals.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

1.     Accept jurisdiction of this case and set it for hearing at the earliest opportunity;

2.     Declare that the actions of the Defendants violated plaintiff's constitutional rights for the reasons noted above;

3.     Award declaratory and/or injunctive relief enjoining Defendants from dismissing Plaintiff from his tenured position with Indiana University and terminating his compensation and benefits.

4.      Declare that Indiana University must provide Plaintiff with a full hearing before an impartial tribunal, allow him to continue in his positon until all proceedings are completed, and provide him with all compensation and benefits during the pendency of the review;

5.      Award Plaintiff his costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and,

6.      Award any other proper relief.

Respectfully submitted,


s/ Linda L. Pence_____
Linda L. Pence, Attorney No. 13198-98
David E. Jose, Attorney No. 5021-49
Suzannah Wilson Overholt, Attorney No. 17148-53
SmithAmundsen LLC
Capital Center South Tower
201 North Illinois Street, Suite 1400
Indianapolis, IN  46204
Telephone: (317) 615-3118; Fax: (317) 615-3119
Telephone: (317) 615-3114; Fax: (317) 615-3115
Telephone: (317) 615-3102; Fax: (317) 615-3103
LPence@salawus.com
DJose@salawus.com
SOverholt@salawus.com

Attorneys for Plaintiff, Rajiv Sood, M.D.